HINDE & DAUCH PAPER CO. v. ATTERBURY BROS., Inc.

(Circuit Court of Appeals, Second Circuit. February 14, 1911.)

No. 88.

1. SALES (§ 177*)—BREACH OF BUYER.

    Defendant, having ratified a contract to buy made by its agent, broke the agreement by refusing to receive final delivery, unless released from obligation under other contracts claimed by plaintiff.

    [Ed. Note.—For other cases, see Sales, Dec. Dig. § 177.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** PRINCIPAL AND AGENT (§ 123*)—AUTHORITY TO BUY—EVIDENCE—SUFFI-
CIENCY.

Evidence *held* insufficient to show that the superintendent of a branch
paper mill was authorized to contract to buy pulp for another mill.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 123.*]

In Error to the Circuit Court of the United States for the Southern
District of New York.

Action by Atterbury Bros., Incorporated, against the Hinde & Dauch
Paper Company. Judgment for plaintiff, and defendant brings er-
ror. Reversed.

This cause comes here upon writ of error to review a judgment of
the Circuit Court, entered upon the verdict of a jury in favor of de-
fendant in error, who was plaintiff below. The action was brought
to recover upon three alleged contracts for the sale of foreign un-
bleached pulp, deliverable at Muncie, Ind.

Rounds & Schurman (A. C. Rounds, R. K. Ramsay, and Harley
L. Stowell, of counsel), for plaintiff in error.

Smith & Bowman (Henry H. Bowman and Harold H. Bowman, of
counsel), for defendant in error.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The defendant is an Ohio corporation
engaged in the manufacture of paper and paper specialties, with mills
at Sandusky and Delphos, Ohio, at Muncie, Ind., and Hoboken, N. J.
Its principal place of business is at Sandusky, and its most important
mill at Muncie. The Hoboken mill is its smallest, with a capacity of but
6 tons a day; the Muncie mill having a capacity of 24 tons. The con-
tracts sued upon are based on orders dated June 17, 1907, June 18,
1907, and July 22, 1907, calling respectively for 150, 150, and 200
tons. The first calls for September, October, and November, 1907,
shipments; the second for February, March, and April, 1908, ship-
ments; the third for May, June, July, and August, 1908, shipments—
all for imported pulp to be delivered at Muncie. The orders are
signed: "The Hinde & Dauch Paper Co., F. W. Castle, Supt." The
circumstances under which these orders were given are as follows:

One Thomas C. Bennett, a broker in New York City, had for many
years been soliciting orders for pulp imported by the plaintiff. He,
as agent for plaintiff, procured these orders from Castle. The plain-
tiff had nothing to do with the transaction, except that upon receiving
the orders from Bennett it acknowledged and accepted them, sending
such acknowledgments to "The Hinde & Dauch Paper Co., Hoboken,
N. J." All three orders are headed "Hoboken, N. J."; the first one
being written on a sheet of paper with letter head of defendant's mill
there, and the other two on Bennett's paper, with his letter head. So
far as appears, neither the plaintiff nor Bennett had any transactions
with defendant prior to July or August, 1906. At that time Bennett
visited the Hoboken mill and was introduced by a gentleman from San-
dusky to Castle, being told that Castle "was the superintendent and
would attend to the business of the mill"; that "Castle was the one who

would do all the buying and purchasing for that mill, and whatever business I did I would have to do through Mr. Castle." Thereafter, and in July, August, September, and October, 1906, orders signed by Castle were given for four lots of paper, from 25 to 36 tons, deliverable to Hoboken mill, or to "our Hoboken mill." In November, 1906, three orders for pulp, 10, 15, and 15 tons, respectively, were given, with like instructions as to delivery; and they were followed by seven other orders for pulp, in quantities from 20 to 60 tons, deliverable "at Hoboken mill," or "from storehouse, less allowance for cartage," or "ex dock port of N. Y.," or "port of N. J.," or "ex steamer port of N. Y."

In June, 1907, Bennett wrote to the defendant at its principal office in Sandusky trying to effect a sale to it of 500 tons imported pulp. Several letters were exchanged, the defendant finally writing that it had already closed contracts for all the pulp it would require in 1907, and that as to Bennett's offer for next year's deliveries the prices named were not satisfactory. Thereupon Bennett interviewed Castle, either at the Hoboken mill or at Bennett's office, and, not telling him anything about his efforts to sell 500 tons to headquarters in Sandusky, procured from him the order of June 17th for 150 tons. In like manner he procured the order for 150 tons, dated June 18th. Bennett testified that this may have been actually signed two or three days subsequent to the date it bears. Subsequently the order of July 22d was procured. There is a conflict of testimony as to what took place between Bennett and Castle when these three orders were obtained; but we need not go into that branch of the case. All controversies as to what passed between them are disposed of by the verdict favorably to the plaintiff. It will be sufficient to consider the defense principally relied upon, namely, that Castle did not have authority to make such purchases for the Muncie mill, and that no declarations and no conduct of defendant are shown which would warrant a finding that there was such an "appearance of authority" that plaintiff was entitled to rely upon it.

Castle promptly notified defendant's office at Sandusky of the fact that he had signed and delivered the order of June 17th. The vice president and treasurer testified that he replied to him, about June 20th, that he had no authority to make such a contract, and that under no consideration was he to attempt anything of the kind again. Nevertheless defendant ratified the order, accepted all deliveries under it, except about 38 tons, and as to those wrote plaintiff on November 30th, asking it to cancel the order, or, if that was not satisfactory, to hold up the shipment until such time as defendant could use the pulp. Plaintiff declined to cancel, but agreed to hold up the shipment for a time. Subsequently, controversy having arisen as to the other orders, defendant, through its counsel, wrote plaintiff, stating that it would accept the 38 tons to adjust the whole controversy. The trial judge held that this was, in substance, a refusal to accept the 38 tons, and left it to the jury to find, upon the testimony as to market value, what were the damages for this breach of contract. His disposition of this cause of action was correct.

The second order, dated June 18th, was signed and delivered according to Bennett's testimony not later than the 20th. Did Bennett

or the plaintiff at that time have reasonable grounds for assuming that Castle had authority to make this purchase for the Muncie mill? Plaintiff's counsel argues that, since New York is the principal port of entry for foreign pulp, it might fairly be supposed that defendant would have some one here as its Eastern representative, authorized to make purchases for all its different mills. In these days of rapid communication by telegraph and telephone, that may not always be a safe assumption; but, if it were, there is nothing in the record to show that Castle held any such position. The Hoboken mill, a small one compared with the others which defendant operated, was bought and the plant got in order in the summer of 1906. It may be presumed—there is no positive evidence of the fact—that Harbrecht, the gentleman from Sandusky who introduced Castle to Bennett, was connected with defendant. But, as we have seen, Castle was introduced simply as the superintendent of the Hoboken mill, "who would do all the buying and purchasing for *that* mill." There seems to us no warrant for the assumption that the superintendent of one mill, who is to do all the buying of materials and supplies for that mill, is authorized by his employer to buy material or supplies for other and larger mills of that employer located in remote states. It would seem that a person who wished to sell something to these other mills would naturally suppose that he should apply to their respective superintendents or to the principal office, which controlled them all. Evidently Bennett supposed so, for he made his first offer of the 500 tons direct to the Sandusky office.

We find nothing in the course of dealing which might induce a belief that Castle's authority was more extensive than was indicated when he was introduced to Bennett. For many months orders were given by Castle, were accepted and filled, and upon delivery of the goods bills therefor were sent to Sandusky by plaintiff and were paid. But, as we have seen, all these orders were for comparatively small quantities. Sixty tons was the largest, there were two for 50 tons each, and the rest ranged from 40 down to 10 tons—quantities within the capacity of the Hoboken mill. Moreover, none of these lots were deliverable elsewhere. They were ordered "at our mill," or "to Hoboken mill," or "ex dock port of New York or port of New Jersey." The circumstance that orders of this sort, when filled in accordance with their terms and bills sent in, were paid for at the financial office in Sandusky, would not warrant a jury in finding that by its course of dealing defendant was giving any one to understand that the superintendent of its Hoboken mill, who it had announced was to do the buying for that mill, had authority to buy supplies or material generally for its other mills in distant states.

Plaintiff lays much stress upon the circumstances that some of the material covered by these orders prior to June 17th was, upon arrival at the port of New York, ordered to be transshipped to Muncie, was sent there by plaintiff, and was accepted and paid for by defendant. The vice president and treasurer of the defendant testified that in the summer of 1907 the Hoboken mill was changed in operation to a different product, which did not require this pulp (or all of it), and in consequence directions were sent to Castle to send on to Muncie some

of the pulp he had ordered for Hoboken. Plaintiff, of course, was not informed as to this reason for the transfer; so it will be necessary to examine more closely into this subject of transshipment directions given to plaintiff, in order to see whether any reliance was placed upon them as indicating an enlargement by defendant of the purchasing authority of Castle. There are four such orders: January 4, 1907 (Exhibit H); January 17, 1907 (Exhibit G); March 8, 1907 (Exhibit V); and June 28, 1907 (Exhibit U). The dates of these orders are not significant. The material purchased was foreign pulp, which apparently was not ordered from abroad until contracts for its sale had been closed. The goods were not offered for delivery under any order until months after the order was received. There is no testimony in the case to indicate that plaintiff in any case received notification to transship to Muncie until the goods had reached the port of New York and were ready for delivery. The plaintiff's testimony showed that the dates of arrival and transshipment of pulp covered by these four orders were as follows: Exhibit H, July 27, 1907; Exhibit G, July 15, 1907; Exhibit V, August 31, 1907; Exhibit U, September 3, 1907. Manifestly, when the order of June 18th (possibly signed June 21st) was given, there had been no occasion when goods bought by Castle had been ordered delivered elsewhere than at Hoboken or New York, so there was nothing of that sort to indicate any enlargement of Castle's original authority. When the third order, here sued upon, was given, July 22, 1907, one single lot of 50 tons had been ordered transshipped to Muncie; but in our opinion that single transaction would not sustain a finding by the jury that the course of business was such as to lead plaintiff to believe that Castle had authority to buy for other mills than his own.

Notification of acceptance of the orders of June 17th and June 18th was not given by plaintiff to the Sandusky office. According to the course of dealing it would communicate with that office only when the goods had been delivered and it was forwarding invoices or statements of account. Authority to make the contract of July 22d cannot, therefore, be inferred from the circumstance that down to that time defendant had not repudiated the orders of June 17th and June 18th.

In our opinion there was not in the case sufficient evidence to justify a submission to the jury of the question whether "there was sufficient evidence to justify the belief that under the course of business Castle did have authority to enter into these contracts."

The judgment is reversed.